Counsel for plaintiff contended that the payments ought to be scaled, and that this had been the practice of the courts heretofore in divers instances; that to allow them as payments according to the nominal amount would be injustice to the plaintiff, as his bonds would then be discharged by one-tenth of their value; and he urged that the payments made being much beyond the sums contained in the bonds, afforded evidence that the defendant believed himself bound to pay as much of the depreciated money as was equivalent in real value to the sums mentioned in the bonds. He argued, further, that the Legislature intended payments made in the time of the war to be reduced by the scale to their real value; for 1783, ch. 4, sec. 11, repeals the tender laws so far as they related to the payment of debt, and by section 7 have ousted all pleas of tender with an "always ready," alleged to be made in the time of the war, unless such pleas be accompanied with affidavits stating that the sum tendered was equal, at the time of the tender, to the debt or damage demanded, according to the then depreciation; and as no tender of the nominal debt made in times of depreciation is good, as by this act it clearly is not, by the same reason no payment made in depreciated money ought to pass to the credit of a bond for more than its real value.
It hath been the constant practice ever since the passing of this act that payments made in the time of depreciation should discharge as much of the debt as such payments nominally amounted to. A contrary decision at this time would revive many of the old disputes that have been settled by that rule, and produce much litigation. When payments were made in depreciated money in time of war, they were generally understood to be equal to the same nominal sum in the bond. Both sums were equally depreciated, both the money in the bond and money paid. Had the creditor sued for his debt, he could have recovered no more than as much depreciated money as numerically (185) equaled his debt. When he received depreciated money for his debt pound for pound, or shilling for shilling, he received precisely what the law allowed him, and what it would have compelled the debtor to pay. Under the laws then existing, the debtor was discharged protanto, according to the numerical sum; and the act of 1783 did not intend to lay any new charge upon the debtor to which he was not subject before, or from which he had been discharged under the operation of the tender laws and payments made before that time; nor is it clear the Legislature could have thus subjected him, had they been so inclined. The act of 1783 meant only to repeal the tender laws so that *Page 135 
they should not operate for the future, not to destroy the effect and operation of the laws upon transactions that had already taken place under them. It must be admitted that a payment made in time of war of the whole numerical sum due upon a bond is a legal discharge of that bond, although the real value of the payment was much inferior to the real value of the money mentioned in the bond at the time of the contract: for no instance ever occurred since the war where such payment has been reduced by the scale. And if the law be so in case of full payments, so it is also in case of partial ones. The case now before us is that of a full payment. Indeed, it is not founded in justice, that the creditor shall receive the full value of his money and be exempted entirely from all loss by depreciation, when the debtor, who perhaps procured the money, or securities for money, at an early period, when the currency was but little if at all depreciated, intending therewith to pay off his debt, shall be allowed only the real value when he received from his debtor and paid it to his creditor, and very likely did this at the request of his creditor. Depreciation was a consequence of the war carried on as well for the benefit of the creditor as the debtor, and he ought at least to bear a part of this burden. As to the argument drawn from section 7 of the act of 1783, that act stopped the circulation of the depreciated paper currency, and had it not made some provision for the cases of tenders made in the time of depreciation, the plaintiff, wherever a legal tender had been made, would by the operation of this act have been barred forever. The defendant might have pleaded the tender with an always ready, and have paid the money that had been tendered into court, leaving the plaintiff no other alternative but to take that or join issue; in which latter case, if the plea proved to be true, he was barred. This would have been a case of hardship, especially where the money had been refused because of its great (186) inadequacy in point of value to the contract. His hardship was prevented by the clause in question. It says nothing of payments actually made; it only provides against a total loss of the debt where the plaintiff has not received the money, and only extends to cases after a certain day when the money had become greatly depreciated, not to cases before. It only places the debtor, who had made an unconscionable tender, in the same situation with one who had made no tender at all. But this is a very different thing from a payment actually made and accepted, and understood at the time to be a discharge. But if the reason of the thing be not in opposition to the doctrine contended for on the part of the plaintiff, the constant practice of our courts hath been; and we ought not to render the law uncertain by a contrary decision.
The plaintiff suffered a nonsuit. *Page 136